Olga ORISEK, Plaintiff,

v.

**AMERICAN INSTITUTE OF AERONAUTICS AND ASTRONAUTICS, Defendant.**

**No. 95 CV 9774 (BDP).**

United States District Court, S.D. New York.

Sept. 3, 1996.

Olga Orisek, White Plains, NY, plaintiff pro se.

Alfred Ferrer, III, Piper & Marbury, New York City, for Defendant.

## MEMORANDUM DECISION and ORDER

PARKER, District Judge.

### BACKGROUND

This action for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, is before this Court on the motion of defendant American Institute of Aeronautics and Astronautics ("the Institute") for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Olga Orisek claims the Institute discriminated against her on the basis of age, gender and national origin by terminating her after 17 years of employment. The Institute moves for summary judgment on the grounds that (1) Orisek cannot establish a prima facie case of discrimination on the basis of age, gender or national origin, (2) even if Orisek can establish a prima facie case, she cannot demonstrate that the Institute's legitimate, non-discriminatory reason for terminating her was pretextual, and (3) compensatory and punitive damages are not available under the ADEA and are limited to $50,000 under Title VII.

Orisek is a 60–year old woman of Czechoslovakian origin. She worked for the Institute in the New York Division from 1976 until she was terminated in 1993, first in a clerical position and finally in the User Services Department in the position of Operations Computer Support Analyst.

The Institute is a non-profit organization. Its New York branch publishes scientific ab-

stracts and technical treatises for the international aviation and aerospace industry. In the mid–1960s, the National Aeronautics and Space Administration ("NASA") formed a partnership with the Institute to create, manage and market a database of scientific information about NASA's aeronautic and space activities. In 1988, NASA signed what would become the Institute's final five-year grant. The grant funded 90% of the Institute's operations and was renewable on a yearly basis.

For fifteen years, through May 1991, Orisek received excellent performance evaluations. In 1987, she was promoted to the position of Operations Computer Support Analyst for the Institute. In 1990, she also worked as Assistant Librarian. In May of 1991, Orisek applied for the position of Library Manager. She was interviewed for the position by the Director of the Institute's New York Division, Barbara Lawrence, but it was offered to and accepted by David Purdy, a 33-year old American man.

Also in 1991, NASA cut back the Institute's funding and ordered the Institute to close its microfiche department. As a result, seven people were laid off. Forced to reduce costs, the Institute reorganized from a traditional management hierarchy to a lateral system emphasizing cross training, a team approach, and fewer departments. As part of that reorganization, in June of 1991, Orisek was reassigned from the supervision of Irene Bogolubsky, the Institute's Technical Director, to the User Services Department under the direction of Geoff Worton.

In November 1992, the Institute was told that NASA had reduced its 1993 grant from $3.6 million to $3.1 million, and became aware that further cuts in funding would occur. With a view towards reducing the Institute's labor force of 58 plus three vacancies, Lawrence directed her managers to conduct a company-wide peer review of employee work performance, evaluating each individual on the basis of their flexibility, productivity and performance. In February 1993, Worton evaluated each individual in the User Services Department. Orisek received the only unsatisfactory evaluation. She and six other employees, one from each department, were terminated in March 1993. Ori-

sek's position of Computer Support Analyst was eliminated.

In December 1993, NASA eliminated all funding to the Institute's New York Division, a budget loss of $2.75 million. An additional twenty employees were laid off in a third reduction-in-force at the end of that year. A fourth layoff occurred in April 1995 as a result of further dwindling funds. The Institute operates today with a staff of less than 20.

## DISCUSSION

■ Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court's responsibility is to perform "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *McNeil v. Aguilos*, 831 F.Supp. 1079, 1082 (S.D.N.Y.1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1985)); *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See McNeil*, 831 F.Supp. at 1082 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam) (other citations omitted)). *See also Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991) (citation omitted).

■ The standards set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), relating to the burden and order of proof in Title VII cases also apply to cases arising under the ADEA. *See Pena v. Brattleboro Retreat*, 702 F.2d 322, 323 (2d Cir. 1983). Under the McDonnell Douglas analy-

sis, the plaintiff must first establish a prima facie case of discrimination. Once the plaintiff establishes a prima facie case, the defendant must produce evidence that the adverse employment action was taken for a legitimate, non-discriminatory reason. After the defendant articulates a legitimate reason for the action, plaintiff may prevail only by showing that the defendant's stated reason was merely a pretext for discrimination, i.e., that it masked the defendant's true discriminatory reason for its action. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

"The burden of establishing a prima facie case is a modest one, but it has substance nevertheless." *Viola v. Philips Medical Sys.,* 42 F.3d 712, 716 (2d Cir.1994) (internal quotation and citation omitted). To establish a prima facie case of employment discrimination under Title VII and the ADEA, Orisek must show (1) she was a member of a protected group, (2) she was qualified for her job, (3) she was discharged, and (4) the discharge occurred under circumstances giving rise to an inference of discrimination. *See Viola,* 42 F.3d at 715–16. There is no dispute that Orisek has shown that she was a member of a protected group and that she was discharged. The Institute argues, however, that Orisek cannot show that she was qualified for her job or that she was discharged under circumstances that give rise to an inference of discrimination.

As evidence that she was qualified for the position and that she was discharged under circumstances giving rise to an inference of age discrimination, Orisek has offered her affidavit describing her work environment following the reorganization in 1991 and the sequence of events surrounding her application for the position of Library Manager and her termination. She also offers her performance reports, her resume, and portions of former employee depositions. She argues that her qualification for the position from which she was terminated is demonstrated by the fact that she received excellent performance evaluations in a job of the same description her previous 15 years of employment. She argues that an inference of dis-

crimination may be drawn from the fact that she received her only unsatisfactory performance evaluation in 17 years of employment a month before her discharge, that on the same day the Institute announced the reorganization in 1991, it hired an outside applicant, who was a younger, American man, for the position of Library Manager, a position for which Orisek had applied and was qualified, that she heard a former employee and the manager of the Processing and Production Department make disparaging remarks aimed at minorities and foreigners, and that several other older foreign women were terminated while younger American men were retained during the reorganization and reduction-in-force.

I need not reach the question of whether this showing is sufficient to establish a prima facie case, however, because I find that, even assuming her circumstantial evidence meets the threshold of sufficiency, she has failed to proffer evidence from which a reasonable jury could find that the Institute's asserted reason for the discharge was a pretext for discrimination. "Given the minimal requirements for establishing a prima facie case of employment discrimination, and the ease with which employers can point to the downsizing procedure to justify any single termination, these cases [involving an individual employee caught up in a reduction-in-force] often turn on whether a plaintiff has established that the rationale offered was a mere pretext for … discrimination." *Viola,* 42 F.3d at 716 (internal quotation and citation omitted).

Assuming that Orisek has established a prima facie case, the burden passes to the Institute to proffer a legitimate, non-discriminatory business rationale for dismissing Orisek. The Institute has offered evidence that it implemented a business-justified, Institute-wide reduction in its work force in response to funding cutbacks, that it relied upon non-discriminatory factors in selecting one employee from each department to be fired, and that the individuals selected for termination were reviewed to ensure that, when viewed as a group, the Institute was not inadvertently violating any civil rights laws.

The Institute has proffered evidence that among the eight employees dismissed in March 1993, there were three American men, one under the age of 30 and all under the age of 45. In addition, a fourth American man of 34 years of age was dismissed for poor work performance in July 1993. The Institute has also demonstrated that older, foreign, female employees were not terminated disproportionately in any of the several reductions-in-force implemented in 1991, 1993 and 1995. The evidence offered by the Institute shows that several female foreign nationals of the same age as Orisek were retained. Finally, the affidavits of the people who implemented the reduction-in-force support the conclusion that the decision to dismiss Orisek was based upon her unsatisfactory work performance irrespective of age, gender or national origin.

■ "Once an employer has produced evidence of a non-discriminatory rationale for its action, the factual inquiry proceeds to a new level of specificity." *Viola*, 42 F.3d at 717 (internal quotations and citations omitted). "Plaintiff retains the ultimate burden of persuasion of proving that intentional discrimination, rather than the explanation offered by the employer was the true reason for the termination. To defeat a properly supported motion for summary judgment, plaintiff must produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not the employee's age[, gender or national origin] was the real reason for the discharge." *Viola*, 42 F.3d at 717 (internal quotations and citations omitted). Summary judgment is "proper only if the evidence of discriminatory intent is so slight that no rational jury could find in plaintiff's favor." *Viola*, 42 F.3d at 716 (citation omitted).

Orisek attacks the apparently neutral mechanisms implemented by the Institute in selecting employees for dismissal on several grounds. First, she argues that her February 1993 performance evaluation was an unjustified criticism made to justify her later firing. Second, she argues that an outside, younger, American male was hired for a position for which she was allegedly more qualified just as the reorganization was beginning

revealing the Institute's animus towards older, foreign women. Third, she argues that the Institute's toleration of disparaging remarks directed at minorities and foreigners reveals the Institute's true discriminatory motive. Fourth, she argues that the Institute's reorganization in 1991 had the effect of excluding older foreign women, including herself, from management level positions. Fifth, she argues that the Institute failed to inform her of job vacancies in April of 1995, but mailed notices to other employees who had been laid off.

■ As to each of these arguments, there is no real factual dispute as to what happened. The only issue is whether they raise a jury issue as to pretext and discriminatory intent. They do not, because all of the events are fully consistent with the conduct of non-discriminatory business affairs, and there is no evidence that casts these events in any other light. The critical omission in Orisek's showing on each of these arguments is the absence of any evidence that the decision to terminate her was motivated by age, gender or national origin. Title VII and the ADEA forbid disparate treatment on the basis of age, gender and national origin, but they may not be invoked merely to challenge the wisdom of an employer's decisions. *See Parcinski v. Outlet Co.*, 673 F.2d 34, 37 (2d Cir.1982), *cert. denied*, 459 U.S. 1103, 103 S.Ct. 725, 74 L.Ed.2d 950 (1983); *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir.1980).

As to the performance evaluation in February 1993, Orisek alleges that it is suspect because it was the first adverse review she had received in 17 years of employment, it was given on the eve of the reduction in force, it was nine months late, and it was unjustified on the merits. The Second Circuit has held, however, that "[d]ismissals are often preceded by adverse performance review [and that were a court] to view this pattern as suspect, without more, many employees would be able to appeal their personnel evaluations to a jury." *Viola*, 42 F.3d at 718.

Although the February 1993 performance evaluation was Orisek's first negative evaluation, it was her first evaluation following the Institute's reorganization and her reassign-

ment to the User Services Department. In relying upon her past performance evaluations, she fails to take into account that she was working in a different environment for a different manager with different expectations. She concedes in her deposition that while her job description, which included "light programming," did not change, she was asked to expand her duties. She specifically acknowledges that even before she was reassigned to the User Services Department, Bogolubsky, her supervisor until 1991, wanted her to increase her programming skills to reduce reliance on outside consulting.

In their affidavits, both Lawrence and Worton state that as the complexity of the Institute's demands on the computer system increased, Orisek had difficulty completing and managing her projects and continued to rely on an outside programmer for almost all of her special project assignments. In addition, they both state that Orisek had problems adapting to the reorganized, lateral team approach at the Institute. Their affidavits are confirmed by documentary evidence, including several memoranda, notes from meetings and Orisek's final performance review, indicating that, in their view, Orisek's reliance on an outside consultant, and her failure to complete projects and work effectively in a team environment were continuing problems despite Worton's efforts to assist her in these areas.

In light of the new expectations accompanying the Institute's reorganization, Worton's February 1993 performance evaluation was not necessarily inconsistent with Orisek's past positive reviews. Even if it were, however, such inconsistency does not support a finding of pretext. "[A] new manager is allowed to appraise an employee's work according to his or her own expectations, even if those expectations are contrary to a prior manager's expectations." *Beers v. NYNEX Material Enters. Co.,* 1992 WL 8299, at *11 (S.D.N.Y. Jan. 13, 1992) (citations omitted). According to Worton and Lawrence, Orisek did not demonstrate the flexibility, initiative and teamwork required of all employees following the reorganization. Thus, although her job description may have remained the same, a different approach was apparently required. Orisek's own disagreement with her employer's perceptions of her job performance does not satisfy her burden of showing that the Institute's proffered justification was a pretext for discrimination. *See Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Arnell v. Pan American,* 1986 WL 11455, at *5 (S.D.N.Y. Oct. 7, 1986) (citations omitted).

As to the Institute's failure to hire Orisek for the position of Library Manager, Orisek alleges that the selection of a younger American man for the position is evidence of the Institute's post-reorganization animus towards older, foreign-born women. Although Orisek has submitted some evidence that she was qualified for the position, she has submitted no evidence that either her or Purdy's age, gender or national origin was a factor in Purdy's selection. The Institute, on the other hand, has submitted the affidavit of Lawrence, who made the hiring decision, Lawrence's notes from applicant interviews, a memorandum written by Lawrence in February 18, 1993 responding to a letter from Orisek dated February 10, 1993, in which Orisek claimed that she was not seriously considered for the position, and the resumes of both Purdy and Orisek.

In her affidavit, Lawrence explains that, in her interview, Orisek emphasized library technology, rather than content and the delivery of service, and that Orisek's management approach differed from her own. Lawrence's notes corroborate her claims. In her notes of the applicant interviews, she listed Orisek among eight other candidates. Next to Orisek's name, Lawrence wrote "Knows our operation, Focus on automation, not good at teamwork/team leader/project mgn, Good at doing, Wants to grow—probably best in a technical role, BL+00—sometimes don't communicate easily." Next to Purdy's name, Lawrence wrote "interviewed May 30, Ready for next step, Knowledgeable with our literature, Well liked within NASA, No managerial experience, but ready for growth, Staff here all responded/related well to him, Ty letter—shows sense of personality and creativity." In the memorandum, dated February 18, 1993, Lawrence again states that the major.

reason that Orisek was not selected was her approach to management. She also mentions that Orisek's writing was not acceptable for external communication without heavy editing, but that Purdy had written the library component of a proposal for his prior employer and had submitted a draft journal article for her review. Finally, Purdy's resume suggests that he had at least the minimal qualifications for the job.

■ Again, although Orisek may have disagreed with Lawrence's choice and believed that she was the most qualified applicant, this Court is not permitted to second-guess the wisdom of Lawrence's selection. *See Lieberman,* 630 F.2d at 67 ("Title VII does not require that the candidate whom a court considers most qualified for a particular position be awarded that position; it requires only that the decision among candidates not be discriminatory. When a decision to hire ... one person rather than another is reasonably attributable to an honest even though partially subjective evaluation of their qualifications, no inference of discrimination can be drawn."). The mere fact that a younger, American man was selected is not a reasonable basis on which to conclude that Orisek was passed over because of her age, gender or national origin. Such speculation, without more, is insufficient to support her claim that the Institute's reorganization or reduction-in-force was pretextual. *See Arnell,* 1986 WL 11455, at *5.

As to the disparaging remarks, Orisek argues that they are characteristic of the discriminatory environment at the Institute following the reorganization in 1991. In her affidavit, Orisek claims that she heard one American male employee tell another foreign female employee in the presence of Worton, Orisek's supervisor, "Go back to Russia!" and that she heard Tony Lenti, Manager of Processing and Production, exclaim "Those foreigners!" and "Those niggers!" In addition, Orisek has offered the deposition testimony of another employee, Danny Luce, in which he states that he also heard the American male employee say "Go back to Russia!" and the deposition testimony of another employee, Maria Sellas, stating that she heard Lenti say "Bitch!" but does not know at whom the remark was directed.

■ There is no evidence, however, that any of these comments were directed at Orisek. Nor is there evidence that the people responsible for the decision to terminate Orisek—Worton and Lawrence—made such remarks or tolerated such remarks. The American male employee that Orisek claimed said "Go back to Russia!" in the presence of Worton was terminated within two months of the incident for poor work performance and for making such comments. "Isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus. [Plaintiff] must demonstrate a nexus exists between these allegedly discriminatory statements and the [defendant's] decision to terminate her." *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 531 (10th Cir.1994); *accord Santa Mantione v. Ted Bates Advertising,* 1985 WL 2516, at *7 (S.D.N.Y. Sept. 10, 1985) (finding comments by someone other than decision-maker irrelevant).

As to the Institute's reorganization, Orisek argues that she and other older, foreign women were forced out of management positions, presumably to clear the way for later termination. She claims that before 1991, three of the nine management level employees, which included herself, were women, seven were of foreign origin and eight were over 40 years old. She claims that after 1991 the new management group of five employees consisted primarily of younger American men; none was a woman, two were of foreign origin and three were over 40 years old. Orisek's showing in this regard is insufficient, however, for two reasons.

■ Although a plaintiff may show pretext by presenting demotion statistics, for statistical evidence to be probative, the sample must be large enough to permit an inference that age, gender or national origin was a determinative factor in the employer's decision. *See Haskell v. Kaman Corp.,* 743 F.2d 113, 121 (2d Cir.1984). The sample here of four demotions out of nine employees is not statistically significant, particularly in light of the reduction-in-force of over two-thirds of the Institute's staff between 1991 and 1995. There is no evidence that older, foreign wom-

en were dismissed disproportionately in any of the several waves of terminations or over-all.

Moreover, "[s]tatistical evidence is significant only if it is trustworthy ..." *Beers,* 1992 WL 8299, at *7. Here, the only evidence supporting Orisek's claims regarding the composition of management before and after the reorganization is the deposition testimony of Bogolubsky, the Institute's Technical Director and Orisek's supervisor until 1991 when she retired, who states that before the reorganization she invited Orisek to meetings of department heads and that Orisek, in addition to the department heads of document processing, indexing, abstracting and document analysis reported directly to her. Orisek, however, has not offered any evidence, such as job descriptions, showing that these employees, including herself, are appropriately grouped as management. *See Cone,* 14 F.3d at 532 ("To made a comparison demonstrating discrimination, a plaintiff must show that the employees were similarly situated."). Moreover, she has not offered any evidence that the two other, older, foreign women in alleged management positions—Irene Bogolubsky and Patricia Marshall—were forced out. In her deposition testimony, Bogolubsky states that she took early retirement, and that there was no litigation nor did she have an attorney representing her in connection with her retirement. The only evidence in the record regarding Marshall's departure, (charts prepared by and attached to the affidavit of Shirley Jacobson, the Institute's Director of Human Resources, depicting the names, ages, gender, national origin, date of hire, and the date and reason for departure of all Institute employees between January 1989 through December 1995), indicates that Marshall also retired in May of 1991.

As to the Institute's failure to notify Orisek of job vacancies while notifying other employees, the Institute has proffered uncontradicted evidence that it notified only employees laid off in its third reduction-in-force, because those terminations were not associated with poor work performance. Orisek was terminated during the second reduction-in-force not only because her position was eliminated but also because of what the Institute perceived as her unsatisfactory work performance.

Having reviewed the evidence offered by Orisek, I conclude that the circumstances of her termination were consistent with a broad-based program of downsizing and restructuring, effected according to standards that were related to business needs and that did not discriminate against older, female and foreign employees. I also find that Orisek has not met her burden of proffering evidence from which a rational jury could find that the Institute's decision to terminate her was motivated by age, gender or national origin. Accordingly, the Institute's motion for summary judgment is granted, and I need not reach the question of whether Orisek's damage claims are tenable.

In conclusion, defendant's motion for summary judgment is granted. The Clerk of the Court is directed to close the case.

SO ORDERED.