Thomas **DAVIDSON**, Plaintiff,

v.

**TIME INC.**, a corporation, Kenneth Carson and Thomas Larkin, Defendants.

No. 94 CV 0937(NG).

United States District Court, E.D. New York.

Aug. 1, 1997.

Leonard N. Flamm, New York City, Gary E. Roth, Robert M. McCaffery, Leib, Kraus, Grispin & Roth, Scotch Plains, NJ, for plaintiff.

Andrew W. Goldwater, Friedman & Kaplan, New York City, for defendants.

## OPINION AND ORDER

GERSHON, District Judge.

Plaintiff Thomas Davidson filed this action in March 1994, alleging race discrimination on the part of defendants Time Inc. ("Time"), Kenneth Carson, and Thomas Larkin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981, and the New York Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* Defendants now move for summary judgment, arguing that no reasonable jury could conclude that Davidson was fired on account of his race. For the reasons set forth below, defendants' motion is granted.

### FACTS

Unless otherwise noted, the following facts are undisputed:

*Davidson's Performance*

Davidson worked for defendant Time, Inc. ("Time") from February 1982 to November 1992, when he was dismissed. Davidson began at Time as chief dispatcher in the Mail and Traffic Department. In 1988, he became the manager of Distribution Services, under the supervision of Robert Varisco.

In March 1990, after hearing complaints about the timeliness and reliability of Distribution Services, Time's Vice President of Administrative Services, Rosemarie Di Sapio, assigned responsibility for Distribution Services to Director of Operations, Thomas Larkin. Larkin immediately authorized an outside vendor of mailroom services, Pitney Bowes Management Services ("Pitney Bowes"), to perform an analysis of Time's distribution operations. In June 1990, Pitney Bowes issued a report identifying a number of deficiencies in Distribution Services, including a lack of established performance standards, duplication of effort, over-staffing, and high absenteeism. Soon thereafter, Varisco was relieved of any responsibility for Distribution Services, and plaintiff began reporting directly to Larkin.

In late 1990, Larkin recommended that defendant Kenneth Carson be put in charge of Distribution Services. Carson became responsible for Distribution Services in January 1991, and plaintiff began reporting to Carson. Carson, in turn, reported to Larkin.

According to Carson, Davidson's performance was unsatisfactory from the start. It is undisputed that Davidson resisted a number of changes proposed by Carson. It is also undisputed that Davidson failed to meet deadlines established by Carson for such tasks as submitting a proposal for establishing an in-house fulfillment center; making a recommendation regarding a pneumatic mail delivery tube; submitting a plan to ensure coverage of the mailroom telephone; evaluating the Reading Mail area; submitting a plan for newspaper deliveries; rewriting job descriptions; and developing an individualized training program for staff members.

Davidson does not deny that he resisted Carson's suggestions and that he missed a number of deadlines. Instead, he proffers explanations for his behavior. For instance, he maintains that Carson's proposals sometimes failed to take into consideration Time's contract with the Newspaper Guild. He also attempts to justify his failure to timely complete tasks by detailing the problems he confronted with respect to each assignment.

After becoming Davidson's supervisor, Carson twice evaluated Davidson's perfor-

mance as "unsatisfactory," first in September 1991, and again in the summer of 1992. Carson discussed the 1991 review with Davidson and informed him that he was in serious jeopardy of being dismissed if his performance did not improve drastically and immediately. Davidson's performance improved to a satisfactory level at the end of 1991, and Davidson therefore received a merit-based salary increase in April 1992. Nonetheless, Davidson's performance deteriorated in the summer of 1992; in fact, most of the missed deadlines enumerated above were to have been met during that time.

On November 16, 1992, Carson met with Davidson and terminated his employment. Carson's decision was approved by Larkin and Di Sapio.

Carson, Larkin and Di Sapio are white, as is Davidson.

### The Newspaper Guild

Davidson's position is that he was dismissed, not because of any problems with his performance, but because Time was under a great deal of pressure to hire minorities in supervisory positions. In support of this position, Davidson cites complaints by members of the Newspaper Guild ("the Guild") regarding Time's hiring practices in Distribution Services. Although Time's employees are not required to join the Guild, a collective bargaining agreement ("CBA") between the Guild and Time governs conditions of employment at Time for employees who do not have supervisory authority. Managers are not Guild members, and the CBA does not apply to management positions such as the one held by plaintiff.

In April and May of 1990, in meetings between Time and the Guild, Guild members complained that a white assistant manager was being trained to fill a management position. Guild members argued that minorities in the department should be trained for the position, rather than having whites hired from outside the company. They noted that, the previous year, they had objected when another white candidate was hired from outside the company to fill a management position.

In spite of these complaints, Time selected a white applicant for the position in question. Soon thereafter, in two June 1990 meetings, Guild members again expressed their dissatisfaction over the failure of Time to promote minority employees to management positions in the department. Shortly thereafter, the Guild filed a formal grievance with respect to this issue.[1]

### Replacing Davidson

#### The Killackey Offer

In an affidavit submitted with the summary judgment motion, Carson states that, after Davidson's termination, he and Larkin offered Davidson's position to Distribution Department Head Bill Killackey, who is white. Similarly, in a reply affidavit, Larkin asserts that he "agree[s] with Mr. Carson's recollection" that they offered Davidson's position to Killackey. At their depositions, neither Carson nor Larkin had indicated that they had offered Killackey the job.[2] In Larkin's reply affidavit, he states that he remembered the offer to Killackey two or three months after his deposition. Carson also submitted a reply affidavit, in which he states that he did not mention the Killackey offer at his deposition because plaintiff's questions did not elicit that information.[3]

---

1. Although the date of the filing of the formal grievance is unclear, the record establishes that the first hearing regarding the grievance was held in November 1990.

2. At Larkin's deposition, he was asked whether "internal candidates" either had applied or were qualified for Davidson's position. In his reply affidavit, Larkin explains that "Killackey had never 'applied' for this position and was not an 'internal candidate' as I would usually understand that phrase because he was outside the Distribution Services Department and was not on a slate of candidates."

Similarly, at his deposition, Carson was asked whether any internal candidates applied for or were interviewed for the position. In a reply affidavit, Carson notes that "Mr. Killackey did not apply for the position and I did not interview him for it. He had been reporting to me .... and I was familiar with his work."

3. "It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987); *see Hayes v. New York City Dept. of Corrections*, 84

At his deposition, Killackey testified that Carson and Larkin offered him Davidson's position over a dinner meeting in the early 1990s, before Davidson's dismissal. Although Killackey could not definitively state the year of the offer, when asked how old his children were at the time of the offer, Killackey estimated that they were five years younger than they are now, thereby suggesting that he was offered Davidson's position five years ago, in 1992. Killackey further testified that he was surprised by the offer because the mailroom was outside his area of expertise and that he ultimately rejected the offer because it was a lateral move rather than a promotion.[4]

*The Brown Offer and the Withdrawal of the Grievance*

After Davidson was dismissed, Time's Human Resources Department was notified of the job opening. Carol Ducas, a director of staffing and development in that department, retained Milo Research, an executive search firm, to help identify minority applicants. Ducas explained that she retained Milo because she knew that ordinary channels—such as referrals, Time's internal job listing, and unsolicited resume files—would not generate a slate of qualified minority candidates. Ducas interviewed five minority applicants and one white applicant for the position. Carson then interviewed two of the minority applicants, as well as the one white applicant, who had been screened by Ducas. Lance Brown, a black male, was hired.

In July 1993, several months after Brown was hired to replace Davidson, the Guild withdrew the grievance that it had filed over the hiring of whites for management positions in the mailroom. Guild Chairperson Key Martin testified at his deposition that the grievance was withdrawn because a minority (Brown) was hired. Martin also stated that the Guild's decision to withdraw the grievance "could well have happened without any interaction with management."

## ANALYSIS

### Summary Judgment Standard

Motions for summary judgment are granted if there is no genuine issue of material fact and it is clear that the moving party is entitled to judgment as a matter of law. *See PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1111 (2d Cir.1997). The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995). However, a party cannot overcome a motion for summary judgment by relying on mere speculation as to the nature of the facts. *See id.*

As this is a discrimination case, it is important to note that

> [a] victim of discrimination is ... seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence.... Consequently, in a Title VII action, where a defendant's intent and state of mind are placed in issue, summary judgment is ordinarily inappropriate.

*Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991) (citations omitted). On the other hand, "[t]he summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). *See also Meloff v. New York Life Ins. Co.,* 51 F.3d 372, 375 (2d Cir.1995); *McLee v. Chrysler Corp.,* 38 F.3d 67, 68 (2d Cir.1994).

---

F.3d 614, 619 (2d Cir.1996). Nevertheless, "a material issue of fact may be revealed by [a party's] sworn testimony that amplifies or explains, but does not merely contradict, [that party's] prior testimony, especially where the party was not previously asked sufficiently precise questions to elicit the amplification or explanation." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996). Because defendants' affidavits in this case are arguably consistent with their deposition testimony, in the interests of justice I re-

opened discovery to allow plaintiff to depose Killackey.

4. Without seeking leave of the court, defendants have submitted an affidavit from Killackey supplementing his deposition testimony; and, in turn, plaintiff has submitted an affidavit responding to Killackey's affidavit. I have considered neither of those two affidavits in deciding the motion before me.

In this case, having reviewed the evidence with the awareness that discriminatory intent is often difficult to establish, I am nonetheless persuaded that Davidson's evidence is insufficient to create a fact issue as to the existence of discrimination.

### Davidson's Discrimination Claims

In Title VII cases, at the summary judgment phase, the plaintiff must first prove a prima facie case that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Once the plaintiff has proved a prima facie case, the employer must articulate a legitimate, non-discriminatory business rationale for its actions. *See id.* at 802–03, 93 S.Ct. at 1824–25. Upon such a showing, the burden shifts back to the plaintiff to prove that the allegedly legitimate rationale given was merely a pretext for discrimination. *See id.* at 804, 93 S.Ct. at 1825.[5] But, "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993) (emphasis in original).

> What this [*St. Mary's* holding] means in the summary judgment context is that the plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging [him or] her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision.

*Gallo v. Prudential Residential Serv.*, 22 F.3d 1219, 1225 (2d Cir.1994) (emphasis in original). *See Scaria v. Rubin*, 117 F.3d 652 (2d Cir. 1997); *Woroski v. Nashua Corp.*, 31 F.3d 105, 108–09 (2d Cir.1994).

In this case, assuming arguendo that Davidson has made out a prima facie case, his action fails for the reason that he has not raised a genuine issue of fact on the issue of whether defendants' stated rationale for his dismissal was in fact a pretext for discrimination. The ultimate issue to be determined is whether plaintiff can establish that his race was a determinative factor motivating his dismissal. "The factfinder's disbelief of the reasons put forward by the defendant ... may, together with the elements of the prima facie case, suffice to show intentional discrimination." *St. Mary's*, 509 U.S. at 511, 113 S.Ct. at 2749. However, in this case, no reasonable jury could conclude that the reasons proffered by defendants are a cover for discrimination.

Attempting to establish pretext, Davidson emphasizes, first, that his performance reviews at Time were consistently satisfactory or higher until the September 1991 review, when Carson rated his performance unsatisfactory. Significantly, however, the September 1991 review is the first review Davidson received following the shake-up of Distribution Services and the decision to replace Davidson's former supervisor, Varisco, with Carson. Varisco was relieved of his responsibility for Distribution Services because defendants were dissatisfied with his performance as a supervisor in the department. Accordingly, it is entirely unsurprising that Varisco's assessment of Davidson's capabilities as a manager in Distribution Services differed from Carson's assessment of Davidson's performance; and Varisco's positive reviews of Davidson's performance cannot raise a fact issue with regard to the credibility of Carson's negative reviews. *See, e.g., Orisek v. Am. Institute of Aeronautics and Astronautics*, 938 F.Supp. 185, 190–91 (S.D.N.Y. 1996).

Davidson next asserts that, because he received a merit increase in April 1992 and a "purchasing award" in October 1992, Carson's complaints about his performance should be disbelieved. However, neither the merit increase nor the purchasing award raises an issue of fact as to Carson's evaluation of Davidson's performance. It is undis-

---

5. The same analysis applies to Davidson's claims under the New York Human Rights Law, *see Sutera v. Schering Corp.*, 73 F.3d 13, 16 n. 2 (2d Cir.1995), and under 42 U.S.C. § 1981. *See Hudson v. Int'l Business Machines Corp.*, 620 F.2d 351, 354 (2d Cir.), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980).

puted that Davidson received the merit increase because Carson himself determined that Davidson's performance had improved significantly by November 1991. Thus, the merit increase does not call into question Carson's assessment of Davidson; on the contrary, it is a direct consequence of Carson's assessment at a given time. Similarly, that Davidson received an award together with four other members of a group who successfully negotiated agreements with Federal Express and UPS is insufficient to raise an issue of fact as to whether Carson's complaints about Davidson's performance are false.

■ Finally, Davidson attempts to establish that defendants' rationale for his dismissal was pretextual by questioning the legitimacy of Carson's expectations with regard to deadlines and changes in the department. Notably, Davidson does not deny that he failed to meet deadlines and that he resisted Carson's suggestions; instead, he offers explanations designed to challenge the reasonableness of Carson's business determinations. Title VII may not be used as a vehicle for second-guessing an employer's business judgment; instead, plaintiff bears the burden of establishing that the employer imposed arbitrary or unreasonable demands as a cover for discrimination. *See Scaria v. Rubin,* 117 F.3d 652, 654; *Montana v. First Federal S. & L. of Rochester,* 869 F.2d 100, 106 (2d Cir.1989).

Plaintiff has failed to meet that burden. In support of his contention that he was dismissed because of his race, Davidson argues that defendants fired him in order to appease Newspaper Guild members concerned about the shortage of minority employees in supervisory positions at Time. Davidson's argument hinges on the Guild's filing of a formal grievance in 1990, before Davidson's dismissal, and its withdrawal of that grievance when Davidson was replaced by a minority applicant. The problem with this argument is that the actions and statements of Guild members are not in themselves probative of defendants' state of mind. Davidson has presented no evidence of any behavior by defendants, or of any interactions between defendants and the Guild, establishing that defendants were affected in a material way by the Guild complaints.

Indeed, in the face of the Guild pressure that is so heavily relied on by plaintiff, it is undisputed that defendants offered Davidson's position to Killackey, who is white. The only dispute in the record regarding the offer to Killackey is its timing. Carson and Larkin state that they offered Killackey the position after Davidson's termination in November 1992. Killackey likewise estimates that the offer was made five years ago, or in 1992, but asserts that it was made prior to Davidson's dismissal.

Resolving this dispute in the light most favorable to plaintiff, and assuming that Killackey's recollection is accurate, the offer to Killackey nonetheless belies plaintiff's contention that defendants felt pressure to replace Davidson with a minority candidate as a result of the Guild complaints. The meetings cited by plaintiff as the primary source of pressure from the Guild occurred in April, May, and June of 1990, and the formal grievance was filed by the Guild prior to November 1990. Killackey has testified that he was offered Davidson's position roughly five years ago, an estimate which places the offer as occurring after both the meetings and the filing of the grievance. Thus, in spite of the Guild's complaints, defendants tried to replace Davidson with another white. As such, no reasonable juror could conclude that Davidson's dismissal was motivated by defendants' desire to appease Guild members by taking a supervisory position from a white employee in order to open the position for minority applicants.

Finally, Davidson argues that Carol Ducas's use of an executive search firm to identify minority applicants evidences a discriminatory motive on the part of defendants. However, Ducas's race-conscious effort to ensure a balanced slate of candidates in no way establishes that the hiring of Davidson's replacement was race-based. Instead, it "merely indicates that those considered for [the position] would include [applicants] who were members of minority group," *Silver v. City Univ. of New York,* 947 F.2d 1021, 1022 (2d Cir.1991). That an employer attempted to ensure that candidates of all races had an

equal opportunity to vie for an available position is simply not evidence that the employer then relied on race as a determinative factor in deciding whom to hire. Thus, defendants' hiring of the executive search firm does not raise a genuine issue of material fact with regard to whether defendants' stated reasons for Davidson's dismissal are in fact a cover for discrimination.

## CONCLUSION

All in all, Davidson has failed to produce any evidence from which a reasonable juror could conclude that defendants' stated rationale for his dismissal was pretextual. Accordingly, defendants' motion for summary judgment dismissing plaintiff's action is hereby granted. The Clerk is directed to enter judgment dismissing the complaint.

**SO ORDERED.**