Donna S. JUTE, Plaintiff,

v.

HAMILTON SUNDSTRAND CORPORATION, Defendant.

No. CIV.3:01CV7123(AVC).

United States District Court, D. Connecticut.

June 14, 2004.

Barbara E. Gardner, Manchester, CT, for Plaintiff.

Daniel Adam Schwartz, Felix J. Springer, Day, Berry & Howard, Hartford, CT, Natasha Marie Lipcan, Day, Berry & Howard, Stamford, CT, for Defendant.

## RULING ON THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COVELLO, District Judge.

This is an action for damages and equitable relief brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991 ("Title VII"), and Conn. Gen. Stat. § 46a–60 *et seq.* The plaintiff, Donna S. Jute, alleges that her former employer, Hamilton Sundstrand Corporation ("Hamilton") subjected her to various adverse employment actions, including job termination, in retaliation for her opposition to sexual harassment in the workplace, for assisting a fellow employee with a lawsuit alleging gender discrimination, and for filing a charge of retaliation with the Connecticut Commission on Human Rights and Opportunities and the Equal Opportunity Commission.

The defendant, Hamilton, now moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment, arguing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. The issue presented is whether the plaintiff has raised a genuine issue of material fact that she was subjected to retaliation in employment for engaging in protected activity. For the reasons hereinafter set forth, the court concludes that the plaintiff has failed to raise any genuine issue of material fact and, accordingly, Hamilton's motion for summary judgment is granted.

### FACTS

Examination of the complaint, affidavits, pleadings, Local Rule 56(a) statements, and exhibits accompanying the motion for summary judgment, and the responses thereto, disclose the following undisputed, material facts.

The plaintiff, Donna S. Jute, is a resident of Windsor, Connecticut. The defendant, Hamilton Sundstrand Corporation ("Hamilton") is a corporation established under the laws of the state of Delaware with a principal place of business in Connecticut.

In August of 1986, Jute commenced employment with Hamilton as a customer material attendant in Hamilton's repair and overhaul department in East Windsor, Connecticut. At all times, Jute was an hourly employee and the terms of her employment were covered by a Collective Bargaining Agreement ("CBA") between Hamilton and the International Association of Machinists and Aerospace Workers, AFL–CIO Lodge 743 ("the union").

In 1990, Jute filed an internal complaint of sexual harassment against her supervisor, one John Gamache. As a result of the complaint and a subsequent investigation, Hamilton asked Gamache to resign and he did so.

In 1994, several Hamilton employees were campaigning for positions on the union's executive board. One of the employees was one Maryanne Brunton. During the campaign, Brunton charged that disparaging statements were being made about her on flyers left in the building in which she worked. Soon thereafter, Hamilton initiated an investigation and, in furtherance of that investigation, Jute provided two sworn statements at both Brunton's and Hamilton's request stating that she had witnessed a female co-worker leave flyers about Brunton in a Hamilton ladies' restroom.

In 1995, Brunton filed a lawsuit in the United States District Court for the District of Connecticut under Title VII alleging that Hamilton and the union engaged in gender discrimination arising out of the campaign. *Bruton v. Hamilton Standard,* Civil No. 3:95cv2581 (JBA). On July 9, 1998, Brunton appeared for a deposition in that matter and testified, among other things, that Jute had provided a statement to Hamilton as part of its investigation. Jute herself took no action, directly or indirectly, in support of or related to Brunton's lawsuit against Hamilton.

During this period, one Natonia T.C. Crowe–Hagans served as director of operations for Hamilton's repair and overhaul department. Jute worked on the first shift as a labor grade 7 repair technician III and as a member of the so-called JDE software implementation team. On June 15, 1998, Jute claims that Crowe–Hagans told her that, on September 15, 1998, she would receive a promotion to labor grade 5 for her work on the JDE team. Later that summer and, in particular, one day following the Brunton deposition, i.e., July 10, 1998, Jute claims that Crowe–Hagans abruptly removed her from the JDE team and ordered her back onto the shop floor. Jute claims that she was the only person pulled off the team. However, Jute's immediate supervisor, one Glenn Reinhauer, testified that Crowe–Hagans also removed all other employees from the team except for him and that the team ceased to exist at that time.

In July 1998, and shortly after Jute ceased working on the JDE team, Jute claims that management in the information/systems technology department expressed an interest in hiring her. Jute further claims that a systems manager, one Kirby Strole, inquired of Crowe–Hagans about hiring Jute, but that Crowe–Hagans told Strole that she could not hire her because she did not have a degree. Jute claims that the systems department did in fact employ individuals without degrees, including one Peter Mulkern.

Jute also claims that she asked an aerobics teacher, a person identified only as

"Shelly", as to whether Jute could teach aerobics at Hamilton during the evenings on a paid basis. Jute alleges that Shelly explained to her that she would simply need to be qualified, and that Shelly would qualify her. Jute planned to begin teaching during August 1998. However, Jute claims that "one day" she received an anonymous telephone call in which the caller allegedly told her that he was calling on Shelly's behalf with a message that her services would not be needed.

On September 11, 1998, Jute filed a union grievance requesting job training and claiming that less senior employees were being trained ahead of more senior employees, including herself. On September 23, 1998, pursuant to an agreement with the union, Crowe–Hagans offered all hourly labor grade 7 employees, including Jute, promotion to labor grade 5 so long as they successfully completed qualification training. Senior employees were offered promotion to labor grade 5 on the first shift, and less senior employees were offered promotion to labor grade 5 on the second shift. The CBA controlled the shift determinations. Hamilton ranked Jute at the cutoff, that is, Jute and other employees that were less senior to Jute were offered second shift promotions. Jute accepted the offer and, in November 1998, Jute commenced training. On December 14, 1998, however, Jute revoked her acceptance of the offer because the promotion would have required her to work on the second shift and she had concerns as to who would take care of her daughter. Jute nevertheless continued to train for the labor grade 5 position with Hamilton's consent.

In April 1999, one Brad Dahlquist, manager of Hamilton's environmental control systems business unit, allegedly told Jute that when she qualified and received her inspector stamp, she would be promoted to labor grade 5 on the first shift. In September 1999, Jute completed the qualification training and received her inspection stamp. She did not thereafter receive a promotion.

Later in September 1999, Glenn Reinhauer attempted to get approval from Crowe–Hagans for Jute to travel overseas with the JDE project. When the approval was not forthcoming, one Renee Maclean, a fellow employee, heard Reinauer asked Jute "[w]hy does [Crowe–Hagans] have such a hard on for you?"

In December 1999, Jute claims that one Byron Yost, a Hamilton supervisor, told her that she "would have [a] salaried position so that [she] wouldn't have to worry about [an] hourly layoff." On January 6, 2000, however, Jute claims that Yost told her that Crowe–Hagans had rejected her for the position, and instead offered the job to a salaried employee.

On January 11, 2000, Hamilton laid-off Jute and 19 other labor grade 7 employees. Among the 19 was Jute's brother, whom, like Jute, had previously declined to accept promotion to labor grade 5 on the second shift. Hamilton terminated the employment of all labor grade 7 employees in the area where Jute worked. Crowe–Hagans was the decision-maker. Jute claims that immediately following the lay off, a less senior employee, one James Foley, assumed a labor grade 5 position on the first shift. Jute believes that if she had taken a position as a labor grade 5 employee on the second shift, she would not have been laid off.

Following the lay off, Hamilton compiled a list of terminated employees for possible employment with its sister company, International Fuel Cells ("IFC"). Jute claims that her name was not on the list. A human resources manager at Hamilton, one Jeffrey Odell, attests that, to the contrary, Jute's name was referred to IFC.

IFC thereafter interviewed and hired several former Hamilton employees, including one Linda Ducas. By way of affidavit, Ducas asserts that she interviewed for two positions, one of which involved shipping and handling and required a forklift license. Jute had experience in shipping and handling, and had a forklift license. Nevertheless, unlike Ducas, Jute did not receive an interview.

On May 18, 2000, Jute filed a charge of retaliation with the Connecticut Commission on Human Rights and Opportunities ("CCHRO") pursuant to Conn. Gen.Stat. § 46a–60. She also filed a charge under Title VII with the Equal Employment Opportunity Commission ("EEOC"). Jute claimed that she "was terminated in retaliation for opposing a discriminatory practice [in 1990] and for assisting in a proceeding under state and federal anti-discrimination statutes [in 1998]." As part of the charge, Jute recited that, in August 1999, she was wrongfully denied promotion to labor grade 5 after having received her inspector's stamp, and that, on January 6, 2000, she was wrongfully denied a salaried position which Byron Yost had promised her.

In November 2000, Jute applied for a position at IFC. She thereafter interviewed with one Russell Hubley. After the interview, Hubley checked Jute's references. At least two persons had favorable things to say about her, including one Lisa Zarzicki, who worked for Hubley, and one Larry Alberti, who worked as a supervisor at Hamilton. Hubley also telephoned Byron Yost at Hamilton. Yost told Hubley that he could not discuss Jute because she had a lawsuit against the company.

Jute claims that Hubley telephoned her and offered her a job. Hubley denies that he made any job offer and, in the end, claims that, because of budgetary reasons, he hired no one. Jute also claims that Hubley later told her that he had been stopped at personnel when he attempted to hire her. Jute further states that, when she explained to Hubley that she had a lawsuit against Hamilton, Hubley allegedly stated "that sums up what I heard."

## STANDARD

Summary judgment is appropriately granted when the evidentiary record shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether the record presents genuine issues for trial, the court must view all inferences and ambiguities in a light most favorable to the non-moving party. See *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991), cert. denied, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). A plaintiff raises a genuine issue of material fact if "the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56 "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Liberty Lobby, supra*, at 247–48, 106 S.Ct. 2505 (emphasis original). The Supreme Court has noted that:

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims... [and] it should be interpreted in a way that allows it to accomplish this purpose." *Celotex v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548 (1986).

## DISCUSSION

Hamilton first moves for summary judgment on Jute's claim of discriminatory retaliation. Specifically, Hamilton asserts that, because Jute cannot demonstrate that she engaged in any activity protected by Title VII and, moreover, cannot demonstrate a causal connection between such activity and an adverse employment action, Jute's retaliation claim fails as a matter of law.

In response, Jute maintains that, to the contrary, she engaged in protected activity on multiple occasions beginning in 1990, and that she has adequately demonstrated a causal connection between her protected activities and the many adverse employment actions she suffered, including job termination.

■ Under Title VII, it is:

An unlawful employment practice for an employer to discriminate against any of his employees... because [she] has opposed any practice made an unlawful employment practice... or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under Title VII.

42 U.S.C. § 2000e–3(a), Title VII § 704(a). As set forth above, there are two distinct clauses in § 704(a), i.e., an "opposition clause" and a "participation clause." *Morris v. Boston Edison Co.,* 942 F.Supp. 65, 71 (D.Mass.1996). The activity protected by each clause differs. *Id.* The opposition clause prohibits retaliation because the employee opposed any practice made unlawful by Title VII. *Robinson v. Southeastern Pa. Trans. Auth.,* 982 F.2d 892, 896 n. 4 (3d Cir.1993). The participation clause, on the other hand, prohibits retaliation because the employee charged, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under Title VII. *Id.*

■ As with other Title VII claims, a claim of retaliation is examined using the familiar *McDonnell Douglas* burden shifting analysis. *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1177 (2d Cir.1996). Under this framework, the plaintiff:

has the initial burden of establishing a prima facie case of [retaliation] ... If [she] establishes a prima facie case, the burden shifts to [the defendant] to articulate a legitimate, non-discriminatory reason for the adverse employment decision. If [the defendant] offers a legitimate, non-discriminatory reason for its actions, the burden reverts to [the plaintiff] to show [the] proffered reason was a pretext for discrimination.

*Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1315–16 (10th Cir.1999) (citations omitted).

### A. The Prima Facie Case

To make out a prima facie case of retaliation, the plaintiff must show by a preponderance of the evidence:

(i) participation in a protected activity known to the defendant; (ii) an employment action disadvantaging the plaintiff; and (iii) a casual connection between the protected activity and the adverse employment action.

*Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995).

(i) *Participation In Known Protected Activity*

 Jute argues that she engaged in protected activity known to Hamilton: (1) in 1990, when she filed an internal complaint of sexual harassment against her supervisor, John Gamache, and thereby opposed a practice made unlawful by Title VII; (2) in 1994, when she provided two sworn statements to Hamilton after fellow employee Maryann Brunton complained that disparaging statements were being made about her on flyers left in the building in which she worked, and thereby participated in a proceeding under Title VII; (3) in 1998, when she was identified as a witness in Brunton's lawsuit against Hamilton and, again, thereby participated in a proceeding under Title VII; and (4) on May 18, 2000, when Jute filed a charge of retaliation with the CCHRO and the EEOC, and thereby opposed a practice made unlawful by Title VII.

Hamilton does not dispute that Jute's 1990 complaint of sexual harassment or the charge that she filed in 2000 constitute protected activity. Hamilton does contend, however, that items (2) and (3) above are not protected, that is, the two statements that Jute furnished to Hamilton in 1994 as part of an internal investigation, and Brunton's 1998 identification of Jute as a witness in a federal lawsuit. In Hamilton's view, because the 1994 investigation was internal and was not brought pursuant to Title VII, it cannot constitute protected activity. Further, with respect to Brunton's federal lawsuit, Hamilton maintains that, because Jute was only identified as a witness and never testified, submitted affidavits, or actually appeared as a witness, Jute did not "participate" in protective activity within the meaning of Title VII.

The court agrees with Hamilton in part. The participation clause of Title VII § 704(a) prohibits an employer from retaliating against an employee because the employee assisted or "participated in any manner in an investigation, proceeding or hearing under Title VII." *Id.* "The words 'participate[ ] in any manner' express Congress' intent to confer 'exceptionally broad protection' upon employees covered by Title VII." *Deravin v. Kerik,* 335 F.3d 195, 203 (2d Cir.2003). "[T]he term 'any' must be given literal effect." *United States v. Gonzales,* 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997). As set forth above, the investigation or proceeding must be brought under Title VII. *Id.; see also EEOC v. Total Sys.Serv.,* 221 F.3d 1171, 1174 n.2 (11th Cir.2000) ("At a minimum, some employee must file a charge with the EEOC ... or otherwise instigate proceedings under the statute for the conduct to come under the participation clause."). There is no requirement, however, that such participation be "active ... affirmative ... action." *Williams v. J.B. Parks Wholesale Florist, Inc.,* No. 3:95cv2599–D, 1997 WL 160194, *2 (N.D.Tex. March 31, 1997) (a person identified without her knowledge as a witness in another person's EEOC charge is participating in protected activity); *United States v. City of Milwaukee,* 390 F.Supp. 1126, 1128 (E.D.Wis.1975) (extending Title VII § 704(a) protection to *potential* witnesses in a Title VII action).

In 1994, Hamilton conducted an internal investigation concerning inappropriate flyers that were found in a Hamilton ladies' room and, as part of that investigation, Jute provided two statements. The investigation was internal and there is no evidence that it was brought under Title VII. Consequently, Jute cannot be said to have been engaged in protected activity. *See Tuthill v. Consol. Rail Corp.,* No. 96–6868, 1997 WL 560603, *3 (E.D.Pa. Aug.22, 1997) ("Title VII's definition of 'protected activity' does not include participation in an internal investigation").

Jute did, however, participate in a proceeding under Title VII when, in 1998, Brunton identified her as a witness during a deposition in a Title VII lawsuit against Hamilton and the union. While Jute never testified, submitted affidavits, or appeared as a witness in that matter, she is nevertheless deemed to have participated in protected activity. *See e.g., Williams,* 1997 WL 160194, at *2.

In sum, the court concludes that Jute engaged in protected activity: (1) in 1990, when she filed an internal complaint of sexual harassment against her supervisor, John Gamache; (2) in 1998, when she was identified as a witness in Brunton's title VII lawsuit against Hamilton and (3) on May 18, 2000, when She filed a charge of retaliation with the CCHRO and the EEOC.

(ii) *Adverse Employment Action*

Jute next argues that Hamilton subjected her to multiple adverse employment actions, when: (1) in July 1998, Crowe–Hagans removed her from the JDE software implementation team one day following the Brunton's deposition in which Brunton disclosed Jute as a witness in her federal lawsuit; (2) in July 1998, the information/systems technology department expressed an interest in hiring her but withdrew that interest when Crowe–Hagans told the systems manager that she could not hire Jute because Jute did not have a college degree; (3) in September 1998, she was denied an opportunity to work as a paid aerobics instructor; (4) in September 1998, Crowe–Hagans did not give her a promised promotion to labor grade 5 for work on the JDE team; (5) in September 1998, Hamilton placed Jute at the cutoff for possible promotion to labor grade 5 on the first shift, that is, Jute and those employees that were less senior to her were offered the less desirable promotion to labor grade 5 on the second shift; (6) in September 1999, Brad Dahlquist did not promote her to labor grade 5 as previously stated even though Jute had earned her inspection stamp; (7) in September 1999, Crowe–Hagans allegedly denied her the opportunity to travel overseas with the JDE team; (8) in December 1999, Crowe–Hagans allegedly denied her a salaried position working with one Byron Yost, (9) in January 2000, Hamilton terminated her employment; (10) in January 2000, Hamilton did not include her on a list for IFC of potential rehires; and (11) in November 2000, Hamilton allegedly gave false information to IFC, including that Jute had filed a lawsuit against Hamilton, and thus prevented her rehire.

In response, Hamilton maintains that the only adverse employment action that may be considered here is the action that gave rise to her CCHRO charge and her EEOC charge, that is, her layoff. In Hamilton's view, any adverse employment actions that precede Jute's job termination are barred by the statute of limitations and by her failure to first file charges with the CCHRO and the EEOC. Hamilton further asserts that any adverse employment action arising subsequent to Jute's job termination is barred because Jute never filed a CCHRO or EEOC charge on such claims.

In reply, Jute maintains that the "claims based on these employment actions are not time barred... [because] the retaliation against [Jute] was 'continuous' from the date she was removed from the JDE team in July 1998." The court cannot agree.

■ "A Title VII plaintiff must file a charge with the EEOC within 180 days of the violation or, where the plaintiff first files with a state or local equal employment agency [i.e., the CCHRO], within 300 days of the violation." *Gomes v. Avco Corp.,* 964 F.2d 1330, 1332–33 (2d Cir.

1992). "Where a continuing violation can be shown, the plaintiff is entitled to bring suit challenging all conduct that was part of that violation, even conduct that occurred outside the limitations period." *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994). "A continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period." *Place v. Abbott Laboratories,* 215 F.3d 803, 807 (7th Cir.2000). " 'Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire' [are easy to identify and hence] are 'not actionable if time barred, even when they are related to acts alleged in timely filed charges.' " *Tademe v. Saint Cloud State University,* 328 F.3d 982, 987 (8th Cir. 2003) (*quoting Nat'l R.R. Passanger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). Each such occurrence "starts a new clock for purposes of filing charges related to that act, and an employee must file charges within 180 days or 300 days (whichever is applicable) of a discrete discriminatory action." *Id.*

■ Further, "[a] district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Butts v. New York Dep't of Hous. Preservation & Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993). "[T]he purpose of the [Title VII] exhaustion requirement... is to give the administrative agency the opportunity to investigate, mediate, and take remedial action." *Stewart v. United States Immigration and Naturalization Service,* 762 F.2d 193, 198 (2d Cir.1985).

### A. Conduct Occurring Prior To The EEOC Charge

■ On May 18, 2000, Jute filed a charge of retaliation with the CCHRO and the EEOC claiming that she "was terminated in retaliation for opposing a discriminatory practice [in 1990] and for assisting in a proceeding under state and federal anti-discrimination statutes [in 1998]." As part of the charge, Jute also recited that: (1) in August 1999, she was wrongfully denied promotion to labor grade 5 after having received her inspector's stamp, and that: (2) on January 6, 2000, she was wrongfully denied a salaried position which Byron Yost had promised her. Because each of these claims are included in the EEOC charge and are alleged to have occurred after July 23, 1999, that is, within 300 days of the May 18, 2000 filing, they may be considered here. The court may not consider, however, each of Jute's claims that are alleged to have occurred prior to the 300 day limitations period, that is, prior to July 23, 1999. These claims [1] are easily identified as discrete acts upon which Jute should have filed separate charges, and consequently the continuing violation doctrine may not be employed to save them. Further, the court also may not consider Jute's September 1999 claim of retaliatory refusal to authorize travel with the JDE team, and her January 2000 claim of retaliatory refusal to refer her name to IFC for potential hire because, although they arose within the 300 day

---

1. The claims include Jute's: (1) July 1998 claim of retaliatory removal from the JDE software team; (2) July 1998 claim of retaliatory refusal to hire by the information/systems technology department; (3) August/September 1998 claim of retaliatory refusal to hire her as an aerobic instructor; (4) September 1998 claim of retaliatory refusal to promote for work on the JDE team; and (5) September 1998 claim of retaliatory placement on the promotion list for second shift.

limitations period, Jute failed to raise them in her EEOC filing.

### B. *Conduct Occurring After The EEOC Charge*

"[C]laims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency." *Deravin, III v. Kerik,* 335 F.3d 195, 200–01 (2d cir.2003) A claim is reasonably related if it "is one alleging retaliation by an employer against an employee for filing an EEOC charge." *Butts v. City of New York Dep't of Housing Preservation and Development,* 990 F.2d 1397, 1402 (2d Cir.1993). In this case, Jute alleges that, in November 2000, Hamilton retaliated against her after she filed her EEOC charge by furnishing a false reference to IFC in order to prevent her rehire. Because the claim alleges retaliation, it is reasonably related as a matter of law and not subject to exhaustion.

In sum, the court may consider only the following alleged adverse employment actions: (1) a January 11, 2000 retaliatory job termination; (2) an August 1999 wrongful denial of promotion to labor grade 5 after having received her inspector's stamp; (3) a January 6, 2000 wrongful denial of a salaried position which Byron Yost had promised her; and (3) a November 2000 retaliatory furnishing of a false reference to IFC to prevent Jute's rehire.

### (iii) *Causal Connection*

"Proof of the causal connection can be established indirectly by showing that the protected activity was closely fol-

lowed in time by the adverse action." *Manoharan v. Columbia University Co. of Phys. & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988).[2] *See Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998) (plaintiff established causal connection where discharge came less than two months after filing a complaint with her employer and just ten days after filing a complaint with the New York division of human rights).

"[A] substantial time lapse between an employee's protected activity and the adverse employment action is counter-evidence of any causal connection between the two for purposes of a retaliatory action." *Reed v. Connecticut Dep't of Trans,* 161 F.Supp.2d 73, 83 (D.Conn.2001) (*citing Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469, 480 (7th Cir.1995) (concluding that twenty month gap between the protected activity and adverse employment decision discounted evidence of causal connection)); *Bayard v. Riccitelli,* 952 F.Supp. 977, 987 (E.D.N.Y.1997) (one year gap between employee's complaints and adverse employment action was too long to establish a causal connection between those complaints and her termination); *see also Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85–86 (2d Cir.1990) (passage of three months too long to suggest a causal relationship).

Applying these principles, the court concludes that significant lapses of time between Jute's protected activity and the adverse employment actions she suffered discount the lion's share of the causal connections sought to be established. Certainly, Jute's 1990 complaint of sexual harassment is far too remote in time to be

---

2. An employee may also demonstrate proof of casual connection through evidence such as disparate treatment of fellow employees engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester County Med. Ctr.,* 821 F.2d 111, 115 (2d Cir.1987). Jute has not shown any such disparate treatment or direct evidence of retaliatory animus.

causally linked to any of the adverse actions occurring in 1999 or 2000. Similarly, the July 9, 1998 disclosure of Jute as a witness in Brunton's Title VII lawsuit is also too far removed from the September 1999 promotion denial (over one year)[3], the January 6, 2000 salaried position denial (over one year), or the January 11, 2000 lay off (over one year).[4]

■ However, the court concludes that the six months that passed between Jute's May 18, 2000 CCHRO/EEOC filing and the allegedly false employment reference that Hamilton gave to IFC concerning Jute is not too remote in time to constitute evidence of a causal connection. Though six months is somewhat of an extended period, opportunities for retaliation after an employee has been terminated do not immediately present themselves. *See e.g., Mandell v. County of Suffolk*, 316 F.3d 368, 384 (2d Cir.2003).

In sum, Jute has established a causal connection with respect to her claim that Hamilton retaliated against her by providing IFC with a false employment reference on account of her charge of retaliation with the CCHRO and the EEOC after Hamilton terminated her employment.

■ To establish a prima facie case retaliation where the purported adverse employment action is a false reference, a plaintiff must offer more. The plaintiff must come forward with evidence "that the statements of the former employer caused or contributed to [her] rejection by the prospective employer." *Sarno v. Douglas–Elliman Gibbons & Ives*, 183 F.3d 155, 160 (2d Cir.1999). The record is devoid of any such evidence. There is no affidavit or other sworn testimony from an IFC official attributing its decision to deny Jute employment to any communication by a Hamilton employee. To the contrary, Larry Alberti of Hamilton gave Jute a favorable reference, and Byron Yost simply provided no statement at all because of Jute's pending charge with the CCHRO and the EEOC.

Because Jute has failed to establish a prima facie case of retaliation in violation of Title VII, Hamilton is entitled to judgment as a matter of law.[5]

---

**3.** Jute claims that in April 1999, one Brad Dahlquist, manager of Hamilton's environmental control systems business unit, allegedly told Jute that when she qualified and received her inspector stamp, she would be promoted to labor grade 5 on the first shift. Upon being denied this opportunity at the time of her qualification in August/September 1999, Jute claims herein a retaliatory denial of a promotion. There is no evidence in the record, however, that Dahlquist ever had the authority to make such a promise, as such offers were controlled by the CBA. If such a promise had been honored, it is likely that it would have been void as unlawful. *See Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 687, 64 S.Ct. 830, 88 L.Ed. 1007 (1944) (holding that any individual contract entered into between the company and its individual employees would be unlawful because the NLRA makes it an unfair labor practice for an employer to bargain directly with employees over the terms and conditions of employment); *see also NLRB v. Local 46*, 149 F.3d 93, 108 (2d Cir.1998) ("The law leaves knowing parties to an illegal agreement where it finds them and gives no relief.")

**4.** During her deposition, Jute's admitted that she did not believe that she would have been laid off had she accepted promotion to labor grade five on the second shift. In addition to Jute's failure to raise a prima facie case of retaliation in connection with her lay off, this admission compels judgment for Hamilton on Jute's claim of retaliatory job termination.

**5.** Because Hamilton is entitled to summary judgment on Jute's Title VII claim, Hamilton is also entitled to summary judgment on Jute's claim on count two alleging retaliation in violation of Conn. Gen.Stat. § 46a–60.

## CONCLUSION

For the foregoing reasons, Hamilton's motion for summary judgment is GRANTED (document no. 57).

It is so ordered, this 14th day of June, 2004, at Hartford, Connecticut.